## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:

BRADLEY AARON SEWELL,

           Debtor.

Case No.: 21-15615-KHT

Chapter 7

FIVE POINTS MANAGEMENT GROUP, INC,

           Plaintiff,

vs.

BRADLEY AARON SEWELL,

           Defendant.

Adversary No. _____

## COMPLAINT OBJECTING TO DISCHARGE OF DEBTOR AND FOR A DETERMINATION EXCEPTING DEBT FROM DISCHARGE

Plaintiff, Five Points Management Group, Inc. ("Plaintiff"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.    This is an adversary proceeding by Plaintiff: (i) objecting to the discharge of Bradley Aaron Sewell ("Debtor") pursuant to sections 727(a) and

727(c) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 4004; and (ii) for a determination excepting a debt under section 523(a)(6) of the Bankruptcy owed by Debtor to Plaintiff from discharge pursuant to section 523(c)(1) of the Bankruptcy Code and Bankruptcy Rule 4007.

## JURISDCITION AND VENUE

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

3.      Venue is proper in this district under 28 U.S.C. § 1409(a). This adversary proceeding is related to a bankruptcy case under Chapter 7 that is pending in this district as Case No. 21-15615-KHT.

4.      This adversary proceeding is commenced pursuant to sections 727(c) and 523(c) of the Bankruptcy Code and Bankruptcy Rules 4004(a), 4007, and 7001(4) and (6).

5.      Plaintiff consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

## PARTIES

6.      Plaintiff is the holder of an unsecured claim against the Debtor.

7.      Plaintiff's claim is based on a judgment entered on August 20, 2021 and amended on October 26, 2021 by the United States District Court for the District of Colorado in Case No. 1:20-cv-02599-RBJ.  Judgment was entered

against the Debtor and Campaign, Inc., jointly and severally, in the amount of $2,219,276.52 plus post-judgment interest at the rate of 0.08% per annum on the unpaid balance from August 20, 2021 until the Judgment is satisfied.

8.     The Debtor is the chapter 7 debtor in the above-captioned bankruptcy case.

9.     The Debtor is an individual.

10.     The Debtor filed for relief under chapter 7 of the Bankruptcy Code on November 10, 2021 ("Petition Date").

## FACTUAL BACKGROUND

**A.     Campaign Was Formed In 2013 By The Debtor And Was Engaged In The Sale of Ready To Assemble Furniture**

11.     Campaign, Inc. ("Campaign") was formed on January 10, 2013.

12.     Campaign was a registered organization formed under the laws of the State of Delaware.

13.     The Debtor founded and formed Campaign and, at all relevant times, was the President and Chief Executive Officer of Campaign.

14.     The Debtor was, at all relevant times, a member of Campaign's board of directors.

15.     Campaign offered "high-quality furniture that ships in days and assembles in minutes."

16.     On its website (www.campaignliving.com), Campaign states: A *modern furniture* company based in the Bay Area, Campaign was founded on the idea of building something better. Our commitment to *do better* starts with great design.  Every component counts. (emphasis in original)"

17.     In his Statement of Financial Affairs, the Debtor assigned a $0.00 value to his 100% ownership interest in Campaign.  *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 1, p. 21.

**B.     Judgment In Favor Of Plaintiff Against Campaign And The Debtor**

18.     On March 1, 2017, Plaintiff subleased its interest in a building located at 4052 Watts Street, Emeryville, California, to Campaign for a period of ten years. The Debtor guaranteed the sublease.

19.     On March 10, 2020, at the request of the Debtor, the parties entered into a Lease Termination Agreement ("LTA"). This agreement required Campaign to vacate the premises immediately and to continue to pay Plaintiff the amounts that would have been due until Plaintiff entered into a replacement lease. These amounts were to be paid "when and as those amounts would have been due had the [s]ublease not terminated." Plaintiff agreed to use reasonable efforts to relet the building.  The LTA also stipulated that Plaintiff was **not** required to accept a replacement lease that was for a term less than the balance of the original sublease or to accept a replacement lease with rent less than the fair market rate.

Furthermore, if the replacement lease had a lower rent than Campaign had been paying, the LTA provided that Campaign would pay the difference in rents to Plaintiff.

20.     On August 19, 2020, Plaintiff notified Campaign and the Debtor that they were in default under the LTA for failure to pay rent, utilities, and property taxes. Plaintiff demanded payment. Neither Campaign nor the Debtor made payment.

21.     On August 27, 2020, Plaintiff filed a complaint for breach of the LTA and breach of the guaranty with the United States District Court for the District of Colorado ("District Court") as Case No. 1:20-cv-02599-RBJ (the "Lawsuit").

22.     On August 20, 2021, the District Court entered an Order Granting Summary Judgment ("Summary Judgment Order") in favor of Plaintiff and thereafter entered a judgment and an amended judgment (collectively, the "Judgment") in favor of Plaintiff and against the Debtor and Campaign.  Judgment was entered against the Debtor and Campaign, jointly and severally, in the amount of $2,219,276.52 plus post-judgment interest at the rate of 0.08% per annum on the unpaid balance from August 20, 2021 until the Judgment is satisfied. *See* Case No. 1:20-cv-02599-RBJ at ECF Nos. 41, 42, 51.

**C.     Texture Supply Was Formed By The Debtor On December 24, 2020 In Order To Avoid Paying Plaintiff**

23.     After the Lawsuit was filed, the Debtor formed Texture Supply, Inc. ("Texture Supply") and, thereafter, engaged in a series of steps to hinder, delay, and defraud Plaintiff from collecting on the Judgment.

24.     Attached hereto as Exhibit "35" is a true and correct copy of Texture Supply's Articles of Incorporation for a Profit Corporation that was filed with the Colorado Secretary of State on December 24, 2020.

25.     At all relevant times, the Debtor was and is the president and chief executive officer of Texture Supply.

26.     At all relevant times, the Debtor was and is a member of Texture Supply's board of directors.

27.     In his Statement of Financial Affairs, the Debtor assigned a $0.00 value to his 100% ownership interest in Texture Supply.  *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 1, p. 21.

**D.     The Debtor Acknowledged That Texture Supply Is The Continuation Of Campaign**

28.     In an email dated December 28, 2020, written just four days after Texture Supply was formed, the Debtor penned an email to three lenders. A true and correct copy of the email is attached hereto as Exhibit "13" and incorporated herein.

29.     In the email, the Debtor states that Campaign is owned by Texture Supply.

30.     The title of the email was: "Investment in CampaignLiving.com (Texture Supply Inc.)."

31.     In the email, the Debtor stated:

> It's a pleasure to connect.  My name is Brad Sewell and **I'm the founder & CEO of an online furniture business called Campaign (CampaignLiving.com) owned by Textured Supply Inc.**  Through clever design and packaging, Campaign offers high-quality furniture that conveniently ships in days and assembles in minutes.  I started building the Campaign brand in 2013 and relocated to Denver in early 2020.  I am currently running the business from Carl's property at 3114 Larimer. (emphasis added)

**E.     Four Days After Its Formation, Michael Andrew Hartman, Clifford C. Hartman and David Hartman Loan Texture Supply $399,999**

32.     Four days after its formation and two day days after the Debtor's email of December 28, 2020, Michael Andrew Hartman, Clifford C. Hartman and David Hartman (collectively, the "Lenders") each agreed to loan Texture Supply $133,333 for a total of $399,999.

33.     For each Lender, their loans are memorialized in a Convertible Note Purchase Agreement and Convertible Promissory Note each dated December 30, 2020.

34.     Each Lenders' Convertible Note Purchase Agreement and Convertible Promissory Note expressly provides that "it is subordinated in right of payment to all current and future indebtedness of the Company for borrowed money (whether or not such indebtedness is secured), to banks, commercial finance lenders or other institutions regularly engaged in the business of lending money."

35.     Each Lenders' Convertible Note Purchase Agreement and Convertible Promissory Note expressly provides that "any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of the Purchase Agreement."

36.     The Convertible Note Purchase Agreement assigned a $6,000,000 valuation cap to Texture Supply.

37.     Prior to making their loans, the Lenders performed no due diligence.

38.     Prior to making their loans, the Debtor testified that the Lenders never met in person with him.

39.     Prior to making the loans, the Debtor testified that he had one discussion with each Lender and that each discussion lasted approximately one hour.

**F.     The Debtor Committed Multiple Acts of Perjury During His Deposition Taken By Plaintiff During The Lawsuit**

40.     Twenty-three days after he authored the December 28, 2020 email to the Lenders, Plaintiff issued a notice of deposition to the Debtor as part of the

Lawsuit and then deposed the Debtor.

41.     The deposition took place on January 20, 2021.

42.     The Debtor was deposed in his individual capacity and in his capacity as the Rule 30(b)(6) representative for Campaign.

43.     The Debtor committed multiple acts of perjury during the deposition.

44.     When asked for Campaign's business address, the Debtor stated that there was no address:

> Q     What is Campaign's business address?
>
> A     They're---there is no business address.
>
> Q     Is there a mailing address for Campaign?
>
> A     They're—there could be an address on file, but there's no place of business.

45.     The answers given by the Debtor were not truthful and he knowingly and fraudulently gave false testimony while under oath.

46.     Twenty-three days earlier, the Debtor stated in his December 28 email that he was "running the business from Carl's property at 3114 Larimer."

47.     Further, as explained in detail below, as of the time of the Debtor's deposition, Campaign had already entered into a lease agreement on May 1, 2020 for property located at 3114 Larimer Street, Denver, Colorado 80205.

48.     Under a section entitled "Intended Use," the lease expressly states that "[t]he Premises shall be used solely for a furniture design showroom, and

residence…."

49.     This lease was still in place when the Debtor was questioned under oath on January 20, 2021.

50.     The Debtor also lied under oath when he testified that Campaign was no longer doing business:

> Q     Is Campaign currently doing business?
>
> A     No.

51.     The Debtor's answer was not truthful. He knowingly and fraudulently lied while under oath.

52.     Just twenty-three days earlier, the Debtor told the Lenders:

> My name is Brad Sewell and I'm the founder & CEO of an online furniture business called Campaign (CampaignLiving.com) owned by Textured Supply Inc. Through clever design and packaging, Campaign offers high-quality furniture that conveniently ships in days and assembles in minutes.  I started building the Campaign brand in 2013 and relocated to Denver in early 2020.  I am currently running the business from Carl's property at 3114 Larimer.

## G.     The Debtor Intentionally Lied To La-Z-Boy Regarding Campaign's Operations

53.     On August 23, 2017, Campaign entered into a Supplier Agreement ("Supplier Agreement") and later an Amendment No. 1 to Supplier Agreement effective as of February 5, 2019 with La-Z-Boy.

54.    Pursuant to the Supplier Agreement, La-Z-Boy supplied furniture products to Campaign's customers at the direction of Campaign.

55.    On October 7, 2020, La-Z-Boy terminated the Supplier Agreement effective December 31, 2020.

56.    At the time of the termination, Campaign was indebted to La-Z-Boy under the terms of the Supplier Agreement.

57.    Knowing that Texture Supply required the intellectual property and data used by Campaign, the Debtor wrote to La-Z-Boy on February 11, 2021.

58.    In his email to Chris Knabusch, Ecommerce Supply and Service Manager for La-Z-Boy, the Debtor requested that Mr. Knabusch "collect the following data regarding Campaign?

- Assembly Bill of Materials with cost information
- Frame Drawings
- Back Cushion Drawings
- Seat Cushion Drawings
- Packaging Drawings (all items + ottoman)
- Pattern & Sew Notes
- Cell floor plan
- Any cell process documents
- Material Specifications (Blown fiber, PU foam)"

59.    In response, Mr. Knabusch stated that "[a]t the present time, the information requested below is not being released to Campaign as it requires authorization from La-Z-Boy's legal counsel.

60.     Not satisfied with Mr. Knabusch's response, the Debtor escalated his request by contacting Steve Krull, who was a VP general counsel and secretary for La-Z-Boy.

61.     In his email to Mr. Krull dated March 5, 2021, the Debtor wrote:

Steve,

Can you please help with this?

I don't understand why we cannot have the data on our own product line.

62.     Four days later, Mr. Krull responded to the Debtor.

63.     In an email dated March 9, 2021, Mr. Krull wrote:

Hey Brad,

We have had a chance to chat internally regarding your request, and we determined that all of the materials that you have requested constitute "Supplier Intellectual Property" under Section 8 of the Agreement, and ownership remains with us.

As you have wound down your operations, we have supported your efforts to satisfy your customers and facilitate as smooth of a transition as possible.  However, the items you have now requested were created by La-Z-Boy, and ***they would only be needed if you were to restart operations in the future with another supplier***. Because we have already written off significant value as a result of Campaign's liquidation, we are hesitant to provide you with those materials.

That said, can you provide us with an update regarding the company's liquidation process?  Have you developed the process by which you will be selling Campaign's

PAGE 12

intellectual property?  We might be interested in
participating in that process.  Once we better understand
where you stand with that process, we can revisit your
request for the items you have requested.

64.     At no time did the Debtor advise La-Z-Boy that Campaign was still

operating under the new name of Texture Supply.

65.     In response to Mr. Krull's email, the Debtor stated: "I understand.

Thank you for the explanation.  Please ignore my data request."

## H.     The Debtor Deceives Campaign's Investors Into Believing That Campaign Has Closed Its Doors

66.     In a deliberate, willful, wanton and fraudulent intent to deceive

Campaign's investors and creditors, the Debtor orchestrated the purported

dissolution of Campaign on December 18, 2020.

67.     Attached hereto as Exhibit "36" is the purported Resolution for the

Dissolution of Campaign, Inc. ("Dissolution Resolution").

68.     Campaign failed to give notice of the dissolution to persons having

claims against the company as is provided for in Del. Code Ann. Tit. 8, § 280.

69.     Despite the Dissolution Resolution, Campaign has not been dissolved

under Delaware law.

70.     The Delaware Secretary of State has no record of Campaign's

dissolution.

71.     Under Delaware law, an entity has to be in good standing before it can file a dissolution.

72.     Campaign forfeited its certificate of incorporation in the State of Delaware.

73.     A certificate, a true and correct copy of which is attached hereto as Exhibit "37" and incorporated herein by reference, issued by the Delaware Secretary of State on February 25, 2022, shows that Campaign is no longer in good standing under the laws of the State of Delaware having become forfeited on October 2, 2021 for failure to obtain and designate a registered agent.

74.     Under Delaware law, forfeiture of a certificate of incorporation does not mean that the corporation ceases to exist as a legal entity.  *In re Efoora, Inc.*, 472 B.R. 481, 487 (Bankr. N.D. Ill. 2012) (citing *Wax v. Riverview Cemetery Co.*, 24 A.2d 431, 436 (Del.Super.Ct. 1942).

## I.     Texture Supply Enters Into Sham Lease Agreement In Continuation Of Campaign's Business

75.     During his January 20, 2021 deposition, the Debtor stated that Campaign had no business address.

76.     This statement was patently false.

77.     On May 1, 2020, Campaign entered into a lease ("Campaign Lease") with Hartman Art Studios LLC (a/k/a Hartman Studios LLC) ("Landlord").  A true

and correct copy of the Campaign Lease is attached hereto as Exhibit "15" and is incorporated herein this reference.

78.     Under the terms of the Campaign Lease, Campaign agreed to lease from the Landlord property located at 3114 Larimer Street, Denver, Colorado 80205 (the "Larimer Street Property").

79.     The Campaign Lease was for a term commencing on May 1, 2020 and ending on March 31, 2025 with one option to renew for an additional five (5) years.

80.     The Campaign Lease obligated Campaign to pay monthly base rent in the first year of $13,500.

81.     At the time the Campaign Lease was entered into, the Debtor told Graeme Brown, who was an investor in Campaign, that Campaign only had $7,000 in the bank and that it would have to shutdown if it did not receive more funds.

82.     The Campaign Lease also required Campaign to post a $27,000 security deposit.

83.     Campaign only made two rental payments to the Landlord and posted the $27,000 security deposit.

84.     Under a section entitled "Intended Use," the Campaign Lease expressly states that "[t]he Premises shall be ***used solely for a furniture design showroom***, and residence….(emphasis added)"

85.     Campaign never completed a lease application for the Larimer Street Property.

86.     The Landlord never performed a credit check of Campaign.

87.     The Landlord performed no due diligence to determine if Campaign was a credit-worthy tenant.

88.     A mere twenty (20) days prior to the District Court entering the Summary Judgment Order, the Debtor orchestrated the transfer of the Lease to Texture Supply.

89.     Notwithstanding the fact that the Campaign Lease was still in effect and had not been terminated, Texture Supply entered into a lease agreement ("Sham Lease") with the same landlord (i.e., Hartman Art Studios LLC) on August 1, 2021.  A true and correct copy of the Sham Lease is attached hereto as Exhibit "16" and is incorporated herein by reference.

90.     The Sham Lease was for a term commencing on August 1, 2021 and ending on December 31, 2025.

91.     With the exception of the change in name and amount of rent, the Sham Lease is identical to the Campaign Lease.

92.     Like the Campaign Lease, the Sham Lease was with Hartman Art Studios LLC (a/k/a Hartman Studios LLC).

93.     Like the Campaign Lease, the Sham Lease was for the same property leased by Campaign and located at 3114 Larimer Street, Denver, Colorado 80205.

94.     Like the Campaign Lease, the Sham Lease provided Texture Supply with one option to renew for an additional five (5) years.

95.     Like the Campaign Lease, the Sham Lease required Texture Supply to post a $27,000 security deposit.

96.     Like the Campaign Lease, the Sham Lease included a section entitled "Intended Use," which expressly states that "[t]he Premises shall be ***used solely for a furniture design showroom***, and residence….(emphasis added)"

97.     Like the Campaign Lease, Texture Supply never completed a lease application for the Larimer Street Property.

98.     Like the Campaign Lease, the Landlord never performed a credit check of Texture Supply.

99.     Like the Campaign Lease, the Landlord performed no due diligence to determine if Texture Supply was a credit-worthy tenant.

100.    Texture Supply did not post the $27,000 security deposit.

101.    The Sham Lease acknowledges that "Landlord has received the security deposit from the tenant before 8/1/2021."

102.    The Sham Lease provided that no rent was payable for the first five months.

103.   Commencing on January 1, 2022, the Sham Lease obligated Texture Supply to pay monthly base rent in the first year of $34,487 or $413,844 for the entire year.

104.   As of April 27, 2022, Texture Supply has not paid any rent under the Sham Lease.

**J.    Texture Supply Obtains Insurance In Continuation Of Campaign's Business**

105.   In March 2021, the Debtor received a quote for business insurance for Texture Supply.

106.   On March 25, 2021, the Debtor received an email entitled: "Selective Quote for Campaign Inc."  A true and correct copy of the email is attached hereto as Exhibit "17" and is incorporated by reference.

107.   In an email dated April 7, 2021, the Debtor responded that he wanted to move forward with the application for insurance.  A true and correct copy of the email is attached hereto as Exhibit "18" and is incorporated by reference.

108.   In the Commercial Umbrella Application (the "Application"), which was signed by the Debtor, the Debtor stated that the applicant was "Texture Supply Inc." with a mailing address of "3114 Larimer St., Denver, CO 80205-2313."  A true and correct copy of the Application is attached hereto as Exhibit "19" and in incorporated by reference.

109.   As part of the Application, the Debtor identified Texture Supply's website as "www.campaignliving.com."

110.   Describing the business operation of Texture Supply, the Debtor stated: "Furniture Mfg or Assembling."

111.   In addition to the Application, the Debtor completed a Tailored Protection Policy Application Colorado ("Tailored Application"), a true and correct copy of which is attached hereto as Exhibit "20" and incorporated herein by reference.

112.   The Tailored Application, which was signed by the Debtor, states that applicant, Texture Supply, is engaged in the business of "Furniture Design and Sales" at "3114 Larimer St, Denver, CO 80205-2313 and that its website is "www.campaignliving.com."

**K.     The Debtor Knowingly and Fraudulently Made a False Oath When He Stated That Campaign Ceased To Exist As Of October 11, 2021 As Texture Supply Is The Successor To And Continuation of Campaign**

113.   On November 10, 2021, the Debtor signed his Statement of Financial Affairs.  *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 1, p. 15.

114.   By signing the Statement of Financial Affairs, the Debtor attested to the following:

> I have read the answers on this Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct.  I understand that making a false statement, concealing

property, or obtaining money or property by fraud in
connection with a bankruptcy case can result in fines up
to $250,000, or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

115.    In response to question 27, the Debtor stated that Campaign's

business existed from/to "1/11/2013—10/11/2021."

116.    The Debtor's response to question 27 as it related to the end date of

Campaign's existence represents a knowingly and fraudulently false statement

made by the Debtor.

117.    Campaign is continuing to do business as Texture Supply.

118.    Texture Supply is the successor to and the continuation of Campaign.

119.    Texture Supply is engaged in the same business as Campaign.

120.    On December 28, 2020, a mere four days after Texture Supply was

formed and ten days after the purported dissolution of Campaign, the Debtor

represented to the Lenders that Texture Supply was owned by Campaign:

My name is Brad Sewell and I'm the founder & CEO of
an online furniture business called Campaign
(CampaignLiving.com) owned by Textured Supply Inc.
Through clever design and packaging, Campaign offers
high-quality furniture that conveniently ships in days and
assembles in minutes.  I started building the Campaign
brand in 2013 and relocated to Denver in early 2020.  I
am currently running the business from Carl's property at
3114 Larimer.

121.    In his Statement of Financial Affairs filed with the Bankruptcy Court,

the Debtor identified Texture Supply's business as "[c]reated to sell 3D Rendering

Services and Furniture." *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 1, p. 15.

122.   In both the Application and Tailored Application, the Debtor described Texture Supply's business as "Furniture Mfg or Assembling" and "Furniture Design and Sales."

123.   The Lease and the Sham Lease both state "[t]he Premises shall be ***used solely for a furniture design showroom***, and residence….(emphasis added)"

124.   All of the principals and officers of Campaign and Texture Supply have at all relevant times been the same: The Debtor is the President and CEO.

125.   The board of directors of Campaign and Texture Supply are the same: The Debtor is a member of board of directors for each entity.

126.   The office for Campaign and Texture Supply are the same: They both operate out of the Larimer Street Property.

127.   The Application and Tailored Application both state that Texture Supply is operating out of the Larimer Street Property.

128.   The Application and Tailored Application, which are both dated April 20, 2021, predate the Sham Lease.

129.   As of April 20, 2021, Campaign, not Texture Supply, was the occupant of the Larimer Street Property.

130.   The transfer of Campaign's business to Texture Supply included no monetary value passing from Texture Supply to Campaign.

131.   The decision makers for both Campaign and Texture Supply are the same: The Debtor.

132.   The Debtor was employed by Campaign.

133.   Sebastian Zoric was employed by Campaign.

134.   The Debtor is employed by Texture Supply.

135.   Sebastian Zoric is employed by Texture Supply.

136.   Campaign and, now, Texture Supply, have the same employees:  The Debtor and Sebastian Zoric.

**L.   The Debtor Knowingly and Fraudulently Made a False Oath When He Testified During His Deposition That Campaign Was Not Currently Doing Business And Was No Longer In Existence**

137.   On December 23, 2021, the Court entered an order allowing Plaintiff to examine the Debtor pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.  *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 14.

138.   On April 27, 2022, Plaintiff deposed the Debtor.

139.   The Debtor knowingly and fraudulently committed multiple acts of perjury during the deposition.

140.   When asked if Campaign was currently doing business, the Debtor unequivocally stated that it was not:

> Q    And as of today, is Campaign still doing business?
>
> A    No, it is not.

141.   When asked if Campaign was still in existence, the Debtor unequivocally stated that it was not:

> Q    As of today, does Campaign still exist?
>
> A    No, it does not.

142.   The answers given by the Debtor were not truthful and he knowingly and fraudulently gave false testimony while under oath.

143.   Attached hereto as Exhibit "38" are screenshots taken from the Campaign's website:  campaignliving.com.  The screenshots were obtained from the website on May 4, 2022.

144.   The campaignliving.com website is indicative of a company that is still doing business and still in existence.

145.   The copyright notice that appears at the bottom of page 6 of Exhibit "38" states: "© 2022 Campaign, Inc."

**M.    The Debtor Knowingly And Fraudulently Made a False Oath During His First Meeting of Creditors That Neither Campaign Nor Texture Supply Were Doing Business**

146.   When questioned by the chapter 7 trustee at the first meeting of creditors, the Debtor knowingly and fraudulently testified, under oath, that neither Campaign nor Texture Supply were doing business.  These statements are false.

147.   When asked at his deposition on April 27, 2022 if Texture Supply was currently doing business, the Debtor was evasive but acknowledged that Texture Supply was an operating company:

Q      Is Texture Supply currently doing business?

A      What do you mean—what do you mean by "business"?

Q      Is it engaged in business?

A      It's a new company.  We're designing a line of furniture. Yeah, we're—we're doing our best to operate and start this business.

148.   Pursuant to a written employment agreement dated March 17, 2021, Texture Supply is paying Sebastian Zoric an annual salary of $45,600.

149.   Sebastian Zoric's position is a full-time Customer Experience Lead for Texture Supply.  Sebastian Zoric reports directly to the Debtor and, pursuant to his employment agreement, he agreed to devote his "full business time, attention, and best efforts to the performance of [his] duties and to the furtherance of the Company's interests."

150.   In addition, the 2021 bank statements for Texture Supply shows activity that is indicative of an operating company.

151.   At the beginning of January 2021, Texture Supply's bank statement showed a balance of $399,999.

152.    As of December 31, 2021, Texture Supply's bank statement showed an ending balance of $254,534.80.

153.    During 2021, Texture Supply spent $145,464.20.

**N.    The Debtor Knowingly and Fraudulently Made a False Oath During His Deposition**

154.    During his deposition on April 27, 2022, the Debtor knowingly and fraudulently made a false statement under oath when he testified that Texture Supply had not engaged in any sales:

> Q    Now, Texture Supply also designs and sells furniture; is that correct?
>
> A    It is a new company.  It doesn't sell anything at the moment.

155.    That statement was false.

156.    Later in his deposition when asked about the source of a deposit that appeared in the August 2021 bank statement for Texture Supply, the Debtor testified that it had sold $10,112 in fabric to a hotel:

> Q    If you look on August 6th under the line item, what's the source of that deposit.
>
> A    That was a customer of Texture Supply.  That is a hotel that could be—is a future Texture Supply customer.  We sold them some fabric that we brokered.  So Texture Supply bought some fabric, and we sold it to this hotel.

157.   Carl Hartman owns a property located at 1950 W. 13th Avenue, Denver, Colorado (the "1950 W. 13th Avenue Property").

158.   During his deposition, the Debtor knowingly and fraudulently testified that neither he nor Texture Supply or Campaign had ever stored anything at the 1950 W. 13th Avenue Property and that neither he nor Texture Supply or Campaign ever entered into a lease agreement for the 1950 W. 13th Avenue Property:

> Q     This is the same property located at 1950 West 13th Avenue: is that correct?
>
> A     That is correct.
>
> Q     At any point in time did you ever either personally or on behalf of Campaign or Texture Supply store anything at that location?
>
> A     No.  He's got tenants in all those buildings.
>
> Q     And, again, neither you nor Texture Supply or Campaign ever entered into a lease agreement—
>
> A     No.
>
> Q     --for that property?
>
> A     No

159.   During his deposition, the Debtor knowingly and fraudulently testified that neither he nor Texture Supply or Campaign had ever entered into a lease agreement for the property located 19224 U.S. Highway 6, Dillon, Colorado (the

"<u>Highway 6 Property</u>") and that other than storing assets belonging to Campaign at the Highway 6 Property that neither he nor Texture Supply nor Campaign ever had any other association with the property:

> Q At any point in time did you personally enter into a lease agreement for this Highway 6 property in Dillon?
>
> A No.
>
> Q Same question this time, but with respect to Campaign.
>
> Did it ever enter into a lease agreement for this property?
>
> A No, it did not.
>
> Q Did Texture Supply?
>
> A No, it did not.
>
> Q So did you have any business purpose at all or association with this property, whether personally or through Campaign or Texture Supply?
>
> A Besides it being a place where Campaign is storing some invaluable—like, unliquidable assets and Sebastian is living there, there's no—I have no business with this property.

160.   These statements related to the 1950 W. 13th Avenue Property and the Highway 6 Property were false.

161.   Attached hereto as Exhibit "39" and incorporated herein is a true and correct copy of an email dated June 13, 2020 from the leasing agent for Carl

Hartman directed to the tenants at the 1950 W. 13th Avenue Property.  Among the tenants included on the email is the Debtor.

162.   Attached hereto as Exhibit "40" and incorporated herein is a true and correct copy of an email dated February 21, 2022 from the Debtor to Brandy De Luna, who is a Merchandiser with Trinidad Benham.

163.   Carl Hartman is the Chairman of Trinidad Benham Corp.'s board of directors.

164.   Attached to the Debtor's email is an excel spreadsheet that is titled: "19224 US-6 Expenses Brad.xlsx."

165.   The excel spreadsheet details expenses either paid by the Debtor or, alternatively, paid by Trinidad Benham Corp. on behalf of the Debtor related to the Debtor's use of the 1950 W. 13th Avenue Property and the Highway 6 Property.

**O.     The Debtor Knowingly and Fraudulently Made A False Oath When He Stated That No Assets Had Been Transferred Into the Trust and That He Owned 100% Of Texture Supply**

166.   On October 15, 2020, the Debtor formed Hickory Lane LLC ("Trust").

167.   According to the Debtor, the Trust was "setup for estate planning purposes."  *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 1, p. 15.

168.   In response to question 25 of his Statement of Financial Affairs, the Debtor stated that "[n]o assets [had been] transferred into [the] Trust."  *Id*. at p. 22.

169.   During his first meeting of creditors, the Debtor testified under oath that no assets had been transferred into the Trust.

170.   During his first meeting of creditors, the Debtor testified under oath that he, in his individual capacity, owned Texture Supply.

171.   On December 24, 2020, the same day that Texture Supply was formed, its board of directors authorized the issuance of 10,000 shares of common stock to the Trust.  *See* Action of the Board of Directors By Unanimous Written Consent in Lieu of a First Meeting, a true and correct copy of which is attached hereto as Exhibit "41" and incorporated herein by reference.

172.   The Debtor knowingly and fraudulently made a false statement under oath when he stated that no assets had been transferred into the Trust.

173.   The Debtor knowingly and fraudulently made a false statement under oath when he stated that he, in his individual capacity, owned Texture Supply.

**P.**   **The Debtor Knowingly and Fraudulently Made A False Oath At The First Meeting Of Creditors**

174.   When questioned by Plaintiff during the first meeting of creditor regarding the amount of Texture Supply's monthly rent owing under the Sham Lease as of January 1, 2022, the Debtor knowingly and fraudulently testified under that it was an estimated $8,000 to $10,000.

175.   This statement was false.

176.   Under the Sham Lease, the monthly rent amount due and owing as of January 1, 2022, is $34,487.

177.   The Debtor knowingly and fraudulently testified under oath during his first meeting of creditors that his salary with Texture Supply was $12,000 a year.

178.    This statement was false.

179.   The payroll summary ("Payroll Summary") for Texture Supply for calendar year 2021, a true and correct copy of which is attached hereto as Exhibit "42" and incorporated herein, shows that the Debtor, in his capacity as an employee of Texture Supply, was paid $28,556.99.

180.   The Debtor knowingly and fraudulently testified under oath during the first meeting of creditors that Texture Supply had no assets.

181.   This statement was false.

182.   The loans made by the Lenders to Texture Supply represents an asset on Texture Supply's balance sheet.

183.   The Debtor knowingly and fraudulently testified under oath during the first meeting of creditors that he did not recall the names of the Lenders.

184.   This statement was false.

185.   Based on the Debtor's relationship with Carl Hartman, as evidenced in paragraphs 186, 187 and 188 of this Complaint, the Debtor's statement that he did not recall the names of the Lenders stretches credulity.

186.   Carl Hartman is the father of the Lenders. After the Petition Date, Carl Hartman traveled with the Debtor on a hunting trip to Nebraska. In April 2021, Carl Hartman and the Debtor traveled to Tennessee and Georgia to visit manufacturing facilities owned by Trinidad Benham Corp. in those states.

187.   Carl Hartman is the sole member of Hartman Art Studios LLC (a/k/a Hartman Studios LLC).  Hartman Art Studios LLC leased the 3114 Larimer Street Property to Campaign and Texture Supply.  In September 2021, Hartman Art Studios LLC purchased assets and intellectual property from Campaign for $45,000.  On October 27, 2021, Hartman Art Studios LLC invoiced Campaign for $35,000 for purported storage fees.

188.   Carl Hartman is the chairman of the board of Trinidad Benham Corp. For the benefit of Campaign, Trinidad Benham Corp. paid Hi-Plains Sunflower Co. $16,607.32 to ship certain assets owned by Campaign from California to Colorado.

189.   When the Debtor testified at the first meeting of creditors that he did not remember the names of the Lenders, he knowingly and fraudulently made a false statement under oath.

**Q.   The Debtor Knowingly and Fraudulently Made Multiple False Statements Under Oath In His Schedules And Statement Of Financial Affairs**

190.   In Schedule B, item no. 19, the Debtor knowingly and fraudulently made a false oath when he reported that Texture Supply held no assets.

191.   This statement was false.

192.   The loans made by the Lenders to Texture Supply represents an asset on Texture Supply's balance sheet.

193.   In Schedule B, item no. 19, the Debtor knowingly and fraudulently made a false oath when he reported that Campaign held no assets.

194.   This statement was false.

195.   During his deposition on April 27, 2022, the Debtor testified that he was storing at the Highway 6 Property  "two 40-foot truckloads" of equipment owned by Campaign.

196.   The Debtor testified that included amongst the property stored at the Highway 6 Property is "a plastic banding machine," which is a "is a very, very, very specialized piece of equipment," "automotive upholstery parts" and Porsche automobile seats that Campaign had purchased for $15,000.

197.   In Schedule I, Part I of his Schedules, the Debtor knowingly and fraudulently made a false oath when he listed his monthly gross income as $1,000.

198.   This statement was false.

199.   In Part 2 of this Statement of Financial Affairs, the Debtor knowingly and fraudulently made a false oath when he reported that he earned $8,500.

200.   This statement was false.

201.   During his deposition taken on April 27, 2022, the Debtor testified that in addition to the income he received from Texture Supply he had other sources of income in 2021.

> Q   At the time in 2021,  you were only being paid by Texture Supply, correct?
>
> A   I worked odd jobs doing contract things.  I helped with photography for an event.  I've worked a parking lot.  Helped with some things.  I've helped people around town move things.  I install art. So there's other—yeah, I had other sources of income other than just working—other than— excuse me, other than the salary for Texture Supply.
>
> Q   In 2021?
>
> A   Yes.

202.   The Debtor's checking account statements from Harvard University Employees Credit Union show deposits of no less than $36,650.41into that account for 2021.

203.   In Schedule I, Part I of his Schedules, the Debtor knowingly and fraudulently made a false oath when he listed his monthly gross income as $1,000.

204.   In Schedule J, the Debtor knowingly and fraudulently made a false oath when he calculated his monthly expenses as $680.

205.   Both of these statements are false.

206.   During his deposition on April 27, 2022, the Debtor testified that Texture Supply paid his personal expenses, which he took as income:

> Q      And can you give me an example of the personal expenses that were incurred on your behalf by Texture Supply?
>
> A      I paid for legal counsel that wasn't Texture Supply's business.  It was my personal business I paid for.
>
> I paid for car insurance that wasn't Texture Supply's business.  It was personal.
>
> I paid—I have to go back and look and really tally it up to—to be accurate.  But off the top of my head, the two biggest things were  a car insurance payment and a legal payment.
>
> Q      And collectively how much did those expenses amount to that were paid by Texture Supply for your benefit.
>
> A      Approximately $10,000.
>
> Q      $10,000?
>
> A      I believe so, yes.
>
> Q      And did you ever reimburse Texture Supply for any of those expenses?
>
> A      No, I did not, because I took it as income.

207.    In Schedule I, Part I of his Schedules, the Debtor knowingly and fraudulently made a false oath when he listed his monthly gross income as $1,000.

208.    Again, this statement was false.

209.    On two separate days in April 2021, the Debtor spent more than he purportedly makes for the entire month.

210.    The Debtor testified during his deposition taken on April 27, 2022 that he made a purchase from "Langdon Tactical" on April 21, 2021 in the amount of $939.50 for "firearms training."

211.    The Debtor testified during his deposition taken on April 27, 2022 that he made a purchase from "Guitar Center" on April 24, 2021 in the amount of $548.38 for "for an old guitar that [he] found in a dumpster and was trying to revitalize."

212.    Using funds that belonged to Campaign, the Debtor spent $4,902.95 on a mountain bike that he purchased on May 4, 2021.  Attached hereto as Exhibit "34" is a true and correct copy of Campaign's May 2021 bank statement showing the purchase.

213.    When questioned at his deposition about the purchase, the Debtor testified that the purchase was for the benefit of an individual, "Carlos," who worked in the "neighborhood" and who repaired a machine owned by Campaign:

Q     There is—under the heading of "Electronic withdrawals," on May 4th there is a withdrawal made for $4,902.95 made payable or withdrawn by YT Industries.

      Can you tell me what that is?

A     Yes. Yes. This was a bicycle purchase. Campaign hired a contractor to help repair some of the equipment that Campaign, Inc., owned, and this gentleman was an immigrant, and instead of—I don't think he had a bank account.

      Instead of being paid for the time he worked with me to fix these things, he wanted a bicycle. So this was what—this is what this transfer was.

Q     Who is the gentleman, and what is his name?

A     I think—I think this name was Carlos.

Q     And what did he—what did he fix?

A     So Campaign, Inc., equipment was damaged in transit. I didn't do the best job probably of packaging it, and the vibration of the machines caused some things to become disconnected. One machine fell over on another one in transit, and things had to be disassembled on another piece of equipment. Welds were broken that failed and crashed down on a machine, and the whole part of a machine had to be disassembled and welded back together.

      I live in an industrial zone, and I found a guy to help me with this. I couldn't—I couldn't do it myself.

Q     How did you find him?

A    He's through a connection that I—I met in this neighborhood.  There's a couple factories—one is across the street from me, and one is next door.  I think—I think I met—I think I met him through an introduction to the guys that were servicing the equipment across the street.

Q    And so you hired him?

A    I asked him to help me out, yeah.  It was COVID, and I wasn't talking—I wasn't out talking to people.  And, yeah, I asked this guy to help me out, to fix this stuff.

Q    What was your agreement with him in term of how he would be compensated, if at all, for this assistance?

A    We talked about it, and this was it.  This was his compensation.

Q    How did you arrive at a $5,000 mountain bike?

A    This is—you know, for the time that he put in helping me out, it's what I think he was worth.

Q    Did he submit to you time records?

A    No, he did not.

Q    Did he submit to you any other invoices?

A    No.

Q    What did he charge you per hour?

A    I didn't keep track of that.

Q    How many hours did he work?

A       I didn't keep track of that.  Probably about a week.

Q       How many house ever day during the week?

A       We worked—I don't know.  I don't know.  I—I'm
        sorry.

214.    Plaintiff is informed and believes and thereon alleges that the Debtor knowingly and fraudulently made a false oath when he made these statements.

215.   If the Debtor's story is to be believed, he paid $5,000 to a gentleman that he did not know in consideration for one week's worth of work.  This is equivalent to $20,000 a month or $240,000 a year.

216.   In Schedule I, Part I of his Schedules, the Debtor knowingly and fraudulently made a false oath when he listed his monthly gross income as $1,000.

217.   In Schedule B, Part 17, the Debtor identified six bank accounts that collectively held a total of $98.47.

218.   Six days after the Petition Date, the Debtor made four deposits totaling $2,802.77 into his checking account with Harvard University Employees Credit Union.

219.   Twenty days after the Petition Date, the Debtor made one deposit for $1,200 into his checking account with Harvard University Employees Credit Union.

220.   Although he reported his gross monthly income as $1,000, the Debtor deposited over $4,000 into his checking account within 20 days of the Petition Date.

**R.     The Debtor Knowingly and Fraudulently Made a False Oath When He Stated That Campaign's Business Was Located In Emeryville, California**

221.   The Debtor knowingly and fraudulently made a false statement under penalty of perjury when he stated in response to question 27 that Campaign's business was located at 4052 Watts Street, Emeryville, CA 94608.  *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 1, p. 15.

222.   As shown by the Campaign Lease, as of May 1, 2020, Campaign's business address was 3114 Larimer Street, Denver, Colorado 80205.

**S.     The Debtor Has Concealed Books, Records, Documents And Papers From Which The Debtor's Financial Condition And Business Transactions Can Be Ascertained**

223.   The Debtor has concealed books, records, documents, and papers, from which the Debtor's financial condition or business transactions can be ascertained.

224.   The Debtor's conduct was not justified.

225.   On December 23, 2021, the Court entered an order allowing Plaintiff to obtain documents from entities owned by the Debtor pursuant to Rule 2004 of

the Federal Rules of Bankruptcy Procedure.  *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 14.

226.   Plaintiff directed a subpoena to Texture Supply requiring it to produce documents described therein.  A true and correct copy of the document subpoena is attached hereto as Exhibit "43" and is incorporated herein.

227.   On January 7, 2022, David M. Rich, counsel for Texture Supply accepted service of the document subpoena directly to Texture Supply. *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 34.

228.   The document subpoena required Texture Supply to produce, among other things, "[c]opies of all statements of Your accounts with any Financial Institution from the date of Your formation to present."

229.   Instruction No. 2 to the document subpoena required Texture Supply to supplement its production:

> Unless otherwise specified in any Request, You shall
> produce responsive documents and communications
> dated December 26, 2022 to the present (and continuing
> beyond the date of these Requests per Your responsibility
> to supplement responses hereto).

230.   Instruction No. 5 to the document subpoena notified Texture Supply that the document request was continuing in order to capture documents that came into existence after the subpoena was served:

> These Requests are continuing in nature.  Accordingly, to
> the extent You cannot now answer a Request because

documents responsive to such Request do not yet exist,
You must supplement Your response to these Requests
when such documents exist.  Supplemental answers are
to be served as soon as reasonably possible after receipt
of such information.

231.   On April 11, 2022, Plaintiff requested that Texture Supply supplement

its document production by producing its bank statements for January, February

and March 2022.

232.   The Debtor refused to produce Texture Supply's bank statements for

January, February and March 2022.

233.   During his April 27, 2022 deposition, the Debtor refused to answer,

based on an instruction from counsel, how much cash Texture Supply was

currently holding:

Q      You also indicated that the company has cash?

A      That is correct?

Q      How much cash does it have on hand currently?

A      I have—currently—

Mr. Rich: I'm going to object.  That deals with Texture
Supply, and we're dealing with 2004 exam of the
financial affairs of Mr. Sewell, that's beyond the scope of
2004.  That's Texture Supply.

So I'm going to instruct my client not to answer.

Mr. Ito: Dave, you'll recall I got a rule 2004 order from
the Court that allowed me to depose not only Mr. Sewell,
but also Texture Supply, Campaign, Hickory Lane.

Mr. Rich: An you are absolutely right, as it deals with the financial affairs of Mr. Sewell.  2004 exam doesn't mean you just walk into a corporation and ask everything about the corporation.

You have to deal with the debtor, and that's Mr. Sewell.

So if you want to ask questions with regard to Mr. Sewell, that's fine. But—your order does not give you carte blanche to ask any type of information about the corporation. It's a 2004 exam of the corporation regarding the financial affairs of Mr. Sewell.

Mr. Ito: And I'm entitled to know how much cash it has in the bank.

Mr. Rich: No, I disagree with you.  That's personal with regard to the company.  That has nothing to do with Mr. Sewell. It has to do with Texture Supply.

Mr. Ito:  He's the sole owner of the company.

Mr. Rich: And if you would like to take it up—

Mr. Ito:  The Chapter 7 trustee agreed during my line of questioning that was, indeed, relevant.

Mr. Rich:  No, he didn't.  He did not.  And if you want to bring with up with Ms. Tyson—Judge Tyson, that's fine.  Buy you're—if you want to ask questions with regard to Mr. Sewell's financial affairs, that's fine.  But now you're getting into the financial affairs of Texture Supply, and Rule 2004 does not permit---

Mr. Ito:  The statements for Texture Supply—

Mr. Rich:  I'm sorry.  What?

Mr. Ito:  Under your reasoning, I wouldn't have been entitled to those.

Mr. Rich:  You know what? We were very generous giving you information about Texture Supply, quite frankly, and he would not give you the bank statements for January, February, and March because that was post petition.  And so we gave—we were very generous in giving you what we gave you to try to cooperate.

But I'm going to instruct him not to answer.  If you have an issue with it, you can take it up with Judge Tyson, and we'll deal with that later.  I'm done.

By Mr. Ito:

Q    Mr. Sewell, your counsel has instructed you not to answer the question relative to how much cash Texture Supply currently has in the bank.

Are you going to follow his instruction?

A    Yes, I believe I should.

234.    On December 23, 2021, the Court entered an order allowing Plaintiff to obtain documents from entities owned by the Debtor pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.  *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 14.

235.    Plaintiff directed a subpoena to Campaign requiring it to produce documents described therein.  A true and correct copy of the document subpoena is attached hereto as Exhibit "44" and is incorporated herein.

236.   On January 7, 2022, David M. Rich, counsel for Texture Supply accepted service of the document subpoena directly to Campaign. *See* Bankruptcy Case No. 21-15615-KHT at ECF No. 34.

237.   The document subpoena required Campaign to produce, among other things, "[c]opies of all Your federal and state tax returns from the date of Your formation to present."

238.   In response, Campaign produced its 2019 tax returns.

239.   Despite multiple requests, the Debtor has failed to produce Campaign's tax returns for 2013 to 2018 and 2020 to 2021.

240.   The Debtor directed Plaintiff to obtain the missing tax returns from Ryan Bourg and inDinero/tempCFO.

241.   Plaintiff served document subpoenas on Ryan Bourg and inDinero/tempCFO seeking, among other things, Campaign's tax returns for 2013 to 2018 and 2020 to 2021.  *See* Bankruptcy Case No. 21-15615-KHT at ECF Nos. 59, 69, 70 and 71.  Neither Ryan Bourg nor inDinero/tempCFO produced any tax returns.

242.   When asked during his April 27, 2022 deposition, the Debtor testified that he was not involved in the tax returns, was not an accountant and was not responsible for the filing of taxes for Campaign:

Q      And I will tell you that we've not received any tax
       returns from either InDinero or tempCFO or Mr.
       Bourg.

       Do you have your tax returns for Campaign for the
       other years with the exception of 2019, which
       you've already produced?

A      I wasn't involved in the tax returns.  TempCFO
       was the firm that was handling things.  I was
       figuring out on how to focus on the business's
       priorities.  I wasn't the accountant.  I wasn't
       responsible for filing the taxes.

       Yes, at the end of the day, I was the leader.  I
       should have—at the end of the day, I've got to hire
       somebody to help me do that, but I didn't keep
       records of all that information.

## T.   The Debtor Willfully and Maliciously Caused Injury To Plaintiff When Caused Plaintiff To Enter Into The LTA Knowing That Neither He Nor Campaign Could Perform And Then Promptly Breached The LTA

243.   The Debtor willfully and maliciously caused injury to Plaintiff when

he requested that Plaintiff enter into the LTA knowing that neither he nor

Campaign could perform and then promptly breached the LTA.

244.   As a result of the Debtor's conduct, Plaintiff incurred damages of

$2,219,276.52 as set forth in the Judgment.

245.   Paragraph 8 of the LTA, entitled "Payment by Sublessee," states:

       As further consideration for Sublessor's execution of this
       Agreement, Sublessee agrees that: (a) until a
       Replacement Lease is executed and the payment of
       monthly rent to Sublessor commences under the
       Replacement Lease, Sublessee shall pay to Sublessor the

amount that would have been due to Sublessor as Rent under the Sublease, when and as those amounts would have been due had the Sublease not terminated pursuant to this Agreement; and, (b) in the event that the amount of the total Rent to be paid to Sublessor under the Replacement Lease for the term of the Replacement Lease, after taking into account the cost of any Tenant Improvements to be paid for by Sublessor, is less than the amount of Rent that would have been due to Sublessor for the balance of the Term of the Sublease had it not terminated pursuant to this Agreement, Sublessee shall pay the difference to Sublessor upon the commencement of the payment of monthly rent to Sublessor under the Replacement Lease.

246.    The term "Rent" is defined as "[a]ll monetary obligations of Sublessee to Sublessor under the terms of this Sublease (except for the Security Deposit) are deemed to be rent ('**Rent**') (emphasis in original)." *See* Air Commercial Real Estate Standard Sublease dated March 1, 2017 ("Sublease"), ¶ 4.1, and addendums thereto dated March 1, 2017, June 22, 2017, April 26, 2018 and March 12, 2019, a true and correct copy of which is attached as Exhibit "2" to the Complaint ("District Court Complaint").  A true and correct copy of the District Court Complaint is attached hereto as Exhibit "45" and incorporated by reference.

247.    The Sublease provides that Campaign shall pay the following utilities: "Sublessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon."  *Id*. at ¶ 4.2.

248.   The Sublease provides that Campaign shall pay all real property taxes and insurance.  Paragraph 6.3 of the Sublease provides that "[d]uring the term of this Sublease and for all periods subsequent for obligations which have arisen prior to the termination of this Sublease, Sublessee does hereby expressly assume and agree to perform and comply with, for the benefit of Sublessor and Master Lessor, each and every obligation of Sublessor under the Master Lease except for the following paragraphs which are excluded therefrom: N/A." *See* Sublease, ¶ 6.4. Paragraph 10.2 of the Standard Industrial/Commercial Single-Tenant Lease—Net ("Master Lease"), a true and correct copy of which is attached as Exhibit "1" to the Complaint, provides that "[i]n addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date." Paragraph 8 of the Master Lease provides that "Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence.

249.   Pursuant to the Sublease Addendum No. 1 dated March 1, 2017, the Base Rent for the period of March 1, 2020 to February 28, 2021 was $20,578 per month.

250.   Pursuant to the Addendum dated for reference purposes only as April 26, 2018, Campaign agreed to pay Deferred Rent of $2,058.42 in forty-eight (48) equal monthly installments.

251.   Campaign signed the LTA by and through its president the Debtor.

252.   The Debtor, in his capacity as guarantor, signed the LTA.

253.   When it entered the Summary Judgment Order, the District Court made the following findings of facts:

> On March 10, 2020, the parties entered into a LTA. This agreement required Campaign to vacate the premises and to continue to pay Plaintiff the amounts that would have been due until plaintiff entered a replacement lease. These amounts were to be paid "when and as those amounts would have been due had the [s]ublease not terminated." Plaintiff agreed to use reasonable efforts to relet the building.  The LTA also stipulated that plaintiff was not required to accept a replacement lease that was for a term less than the balance of the original sublease or to accept a replacement lease with rent less than the fair market rate. Furthermore, if the replacement lease had a lower rent than Campaign had been paying, the LTA provided that Campaign would pay the difference in rents to plaintiff.

254.   The Debtor neither appealed nor challenged the District Court's findings.

255.   In agreeing to the terms set forth in the LTA, Plaintiff relied upon the Debtor's promises in the LTA that Campaign and the Debtor would fully perform their respective agreements as set forth in the LTA.

256.    In reliance on the Debtor's agreement to perform as required by the LTA, Plaintiff agreed to the terms set forth therein and signed the LTA.

257.    The Debtor deliberately and intentionally knew that neither he nor Campaign could perform as required by the LTA.

258.    The LTA is dated March 10, 2020.

259.    In a text message dated February 15, 2020, the Debtor and Aaron Brown, who was with La-Z-Boy, exchanged the following text messages:

> Aaron Brown: "Denver?"
>
> The Debtor: "That's right! It will be a welcomed change and MUCH more affordable.

260.    In a text message dated March 21, 2020, the Debtor authored the following test to Graeme Brown:  "Sorry to bother you. I only have $7K USD in the bank.  Can you help arrange a wire this week?"

261.    Two days later on March 23, 2020, the Debtor again wrote to Graeme Brown: "I'll really need to get cash ASAP or I'll be forced to shut Campaign down.  Can you help with funds this week?"

262.    On March 27, 2020, the Debtor informed Graeme Brown: "I'm in San Francisco, California now but I'm in the middle of moving to Denver, Colorado. Moving trucks come on Monday.  We're all packed up and I have a new place that's 1/3 the cost.  Our guys are moving too. Bad time to be trying to move."

263.   The Debtor's text exchange with Aaron Brown evidences that the Debtor was aware as early as February 15, 2020 that Campaign would vacate the premises and be moving to Colorado where Campaign would execute the Campaign Lease obligating it to payment $13,500 a month in rent.

264.   The Debtor's text exchanges with Graeme Brown evidence that the Debtor knew that Campaign could not satisfy its monetary obligations under the LTA.

265.   The Debtor's conduct was willful in that he intentionally made representations and promises to Plaintiff in the LTA that he knew that neither he nor Campaign could perform.

266.   The Debtor's conduct was malicious as he had actual knowledge or, alternatively, could reasonably foresee that neither he nor Campaign could perform as required under the LTA and that injury to Plaintiff would result from that failure.

## COUNT 1
## FOR A DETERMINATION THAT THE DEBTOR'S DEBTS ARE NOT DISCHARGEABLE PURSAUNT TO 11 U.S.C. § 727(a)(3)

267.   Plaintiff re-alleges and incorporates all allegations of fact contained in paragraphs 1 through 266 as if fully set forth herein.

268.   A discharge is not granted to a Chapter 7 debtor that unjustifiably under the circumstances of the case, conceals, destroys, mutilates, falsifies, or fails

to maintain or preserve records about the debtor's financial condition or business transactions. 11 U.S.C. § 727(a)(3).

269.   Records do not need to be perfect but should be maintained to permit the court and parties in interest to reasonably determine the accuracy of the financial and operational information. See *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 355 (4th Cir. 2007), citing *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992); *Montgomery v. Wood (In re Wood)*, 605 B.R. 395, 400 (Bankr. D. Md. 2019).

270.   The court has discretion to look back more than two years to determine the accuracy of the debtor's books and records. See *Katsiroumbas v. Suits*, 600 B.R. 472, 479-80 (N.D.N.Y. 2019).

271.   By concealing, destroying, mutilating, falsifying, or failing to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained the Debtor violated 11 U.S.C. § 727(a)(3).

## COUNT 2
## FOR A DETERMINATION THAT THE DEBTOR'S DEBTS ARE NOT DISCHARGEABLE PURSUANT TO 11 U.S.C. 727(a)(4(A)

272.   Plaintiff re-alleges and incorporates all allegations of fact contained in paragraphs 1 through 271 as if fully set forth herein.

273.   A discharge is not granted to a Chapter 7 debtor that knowingly and fraudulently makes a false oath or account. 11 U.S.C. § 727(a)(4)(A); *see Pergament v. Gonzalez (In re Gonzalez)*, 553 B.R. 467, 473-75 (Bankr. E.D.N.Y. 2016);

274.   By knowingly and fraudulently making a false oath in or in connection with the case, the Debtor violated 11 U.S.C. § 727(a)(4)(A).

## COUNT 3
## OBJECTION TO DISCHARGE OF A DEBT
## 11 U.S.C. § 523(a)(6)

275.   Plaintiff re-alleges and incorporates all allegations of fact contained in paragraphs 1 through 274 as if fully set forth herein.

276.   By breaching the LTA, the Debtor caused injury to Plaintiff.

277.   By requesting that the Plaintiff enter into the LTA and knowing that the Plaintiff relied upon the Debtor's and Campaign's promises in the LTA, the Debtor acted willfully and maliciously as he was aware at the time the LTA was signed that neither he nor Campaign could perform as required under the LTA.

278.   As a result of the Debtor's conduct, Plaintiff incurred damages of $2,219,276.52 as set forth in the Judgment.

279.   The Judgment against the Debtor is a debt that is not dischargeable under section 523(a)(6) of the Bankruptcy Code.

## REQUESTED RELIEF

WHEREFORE, Plaintiff requests a final judgment of this Court awarding the following relief:

a.  Determining that the debts of the Debtor be ruled nondischargeable pursuant to 11 U.S.C. § 727(a)(3) because Debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained;

b.  Determining that the debts of the Debtor be ruled nondischargeable 11 U.S.C. § 727(a)(4)(A) because Debtor knowingly and fraudulently, in or in connection with the case, made a false oath;

c.  That the Judgment against the Debtor and in favor of Plaintiff in the amount of $2,219276,.52 plus accrued interest at the rate of 0.08% per annum is exempt from discharge pursuant to 11 U.S.C. § 523(a)(6); and

d.  such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Dated: May 6, 2022                    **ITO LAW GROUP, P.C.**


By:  _/s/ Peter W. Ito_____
Peter W. Ito
1550 Larimer Street, Suite 667
Denver, CO 80202
Telephone: (720) 281-5294
Email: peter@itolawgroup.com


**Attorneys for Five Points Management Group, Inc.**